

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75279-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JONATHAN SAMUEL SAGE, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED:  December 18, 2017 |
| | ) | |

VERELLEN, C.J. — Jonathan Sage was convicted of four counts of second degree rape of a child.  The trial court did not instruct the jury that it must find each count required a "separate and distinct" act.  But because the State clearly elected separate acts for each count in closing argument, testimony supported those separate acts, and the court gave a unanimity instruction, it was manifestly apparent to the jury that the State was not seeking multiple punishments against Sage for the same act.  There was no double jeopardy violation.

Sage's challenge to the admission of "other bad acts" evidence fails because the court performed a detailed ER 404(b) analysis and properly concluded the evidence of other bad acts was relevant to the charges.

One victim glared at Sage as he entered the courtroom, and the trial court properly instructed the jury to disregard the behavior. Sage does not establish prejudice, and the trial court did not err when it denied Sage's motion for mistrial.

The State concedes the community custody conditions restricting Sage's daily travel, prohibiting him from possessing drug paraphernalia, prohibiting Internet access, and requiring him to participate in substance abuse treatment are unconstitutionally vague or insufficiently crime related and thus should be stricken. We agree.

After the jury entered special verdict forms unanimously finding the alleged aggravating circumstances were established beyond a reasonable doubt, the trial court concluded those aggravating circumstances were a substantial and compelling reason for imposing an exceptional sentence. Because the judge has no fact-finding role, the sentencing judge was not required to enter any additional findings of fact or conclusions of law.

Therefore, we affirm the conviction and remand with instructions to strike the disputed community custody conditions.

FACTS

Between 2011 and 2014, Jonathan Sage engaged in sexual acts with J.M. and E.M.[1] Sage came into contact with the two brothers because he owned a company at which J.M. and E.M.'s mother worked.

---

[1] Because the victims in this case were minors, they will be identified by their initials.

Sage took the mother and her two sons into his home after the mother and her husband divorced. They lived with Sage for a few months when the boys were eight and nine years old, and again in 2010. When Sage moved to a home on Cattail Lane in Langley, Washington, the mother, J.M., and E.M. moved into their own home on Whidbey Island. Sage continued his relationship with J.M. and E.M., including hikes and dinners. Sage bought food and clothing for them and took them to doctor's appointments.

In 2011, after J.M. started seventh grade, he and Sage started spending more time together. Around that same time, E.M. began spending more time at Sage's house than at his mother's house. When E.M. was around 11 years old, he often slept over at Sage's house, and Sage would take him to school. E.M. said that by age 12, he and Sage began to drink alcohol together. During that time, E.M. would drink "almost every night."[2]

E.M. testified about his first sexual encounter with Sage at the Cattail Lane house. E.M. was "more inebriated than usual," and he and Sage were watching pornography together.[3] E.M. and Sage touched each other and then went into Sage's bedroom, where Sage had sexual intercourse with him. The first encounter with E.M. happened when he was 12 years old, toward the end of his sixth grade school year. E.M. said after that first time "it was fairly frequent, but I

---

[2] Report of Proceedings (RP) (Apr. 7, 2016) at 600.
[3] RP (Apr. 7, 2016) at 606.

can't remember specifically."[4] E.M. testified, "Alcohol had to be involved really in order to [ ] get me to comply with it, I guess you could say."[5] "[I]n most cases," the sexual encounters between E.M. and Sage involved E.M. sexually touching Sage's dog.[6] Sage instigated those contacts with the dog. E.M. testified that Sage made videos of some of their sex acts, recording them on E.M.'s phone and on Sage's digital camera. The videos would end up on Sage's laptop computer.

By the time J.M. was in seventh grade, he started staying at the Cattail Lane house more often. J.M. testified that around that time, he had sexual intercourse with Sage for the first time. One evening, J.M. saw E.M. drinking alcohol, and J.M. said he also wanted some. It was the first time J.M. had consumed alcohol, and a single drink made him "drunk."[7] Later in the evening, J.M. and Sage went into Sage's home office, where J.M. discussed issues he was having "fitting in" at school.[8] That discussion led to Sage having sexual intercourse with J.M.

Days later, J.M. and Sage had intercourse again. J.M. testified that for the next year, he and Sage had intercourse "a few days a week."[9] During that time, at

---

[4] RP (Apr. 7, 2016) at 610.

[5] RP (Apr. 7, 2016) at 611.

[6] RP (Apr. 7, 2016) at 614.

[7] RP (Apr. 6, 2016) at 372.

[8] RP (Apr. 6, 2016) at 374.

[9] RP (Apr. 6, 2016) at 390.

the Cattail Lane house, J.M. walked in while Sage was having intercourse with E.M. when E.M. was 12 years old.

For most of the 2012-13 school year, Sage lived on Bercot Road in Freeland, Washington with the mother, J.M., and E.M. J.M. was in ninth grade that year, and he testified that he continued to have intercourse with Sage. E.M., who was in eighth grade, testified that he and Sage regularly had intercourse.

Next, Sage moved to a house on Coles Road, where he continued to have intercourse with J.M. and E.M. J.M. also walked in on E.M. and Sage having intercourse at the Coles Road house. E.M. said that when he first started to resist intercourse with Sage, "he would get angry at that."[10]

E.M. testified that during the later period of abuse, he became unhappy.

> At that point, I wouldn't say I was happy. I mean, at that time I started to contemplate suicide more. There was a Smith and Wesson M&P 9, 9 millimeter polymer framed pistol, and there was a very loose lock on it. It's a very tall lock, and I could open the case while the lock was still on it and reach in and pull out the handgun, and the ammunition was there, too. So I knew at any time I could kill myself and I could take him with me, but I decided against it because I was thinking of my own family, biological family.[11]

The father of J.M. and E.M. had limited interaction with Sage and "thought everything was all good and well."[12] In the summer of 2014, the mother asked the father to take custody of J.M. and E.M. because she was being evicted from her home.

---

[10] RP (Apr. 8, 2016) at 650.

[11] RP (Apr. 8, 2016) at 652.

[12] RP (Apr. 7, 2016) at 506.

5

E.M. and J.M. moved into their father's home. He allowed J.M. and E.M. to continue visiting Sage and allowed E.M. to occasionally spend weekends with him. The father felt Sage was a good mentor and role model for J.M. and E.M.

On December 5, 2014, Sage picked up E.M. from the father's house for a sleepover. That evening, J.M. told his father about the sexual conduct with Sage. The father testified that he decided not to call Sage or drive to Whidbey to retrieve E.M. that evening. He explained, "I didn't think it would be smart to call the police and have them either [ ] pull him over in a traffic stop or come to his house. I knew he owned a firearm and I thought it may result in a hostage situation."[13]

When confronted, Sage justified the sexual abuse, telling the father "people had been doing this for a long time" and it was "strange that it's looked down upon as far as a relationship between a man and a boy."[14] Sage told the father, "You could call the police and have me arrested. But that wouldn't do anyone any good, and a lot of people would lose their jobs."[15]

The State charged Sage with four counts of rape of a child in the second degree. Counts 1 and 2 each alleged that Sage raped J.M. between September 1, 2011 and June 30, 2012. Each count included allegations of two aggravating circumstances that would justify an exceptional sentence under RCW 9.94A.535(3)(g) and RCW 9.94A.535(3)(n).

---

[13] RP (Apr. 7, 2016) at 517.

[14] RP (Apr. 7, 2016) at 521-22.

[15] RP (Apr. 7, 2016) at 521.

Counts 3 and 4 each alleged Sage raped E.M. between December 19, 2011 and December 19, 2012. Those counts included the same aggravating factors as counts 1 and 2 and that Sage "knew that the victim of the current offense was a youth who was not residing with a legal custodian and the Defendant established or promoted the relationship for the primary purpose of victimization, contrary to RCW 9.94A.535(3)(j)."[16]

The court gave separate to convict instructions for each count. After each to convict instruction, the court gave a corresponding unanimity instruction requiring that "one particular act" of the charged crime must be proven for each count.[17]

The jury was also instructed "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count."[18] But the jury was not instructed that each count required a separate and distinct act.

The jury convicted Sage on all four counts and, by special verdict, found the alleged aggravating circumstances had been established. The court concluded the aggravating circumstances were substantial and compelling reasons to impose an exceptional sentence under RCW 9.94A.535.

Sage appeals his conviction and his exceptional sentence.

---

[16] Clerk's Papers (CP) at 86.

[17] CP at 54, 56, 58, 60.

[18] CP at 45.

ANALYSIS

*Double Jeopardy*

Sage contends the jury instructions violated his right to be free from double jeopardy because they exposed him to multiple punishments for the same offense.

We review a double jeopardy claim de novo, and it may be raised for the first time on appeal.[19] The constitutional guarantee against double jeopardy protects a defendant against multiple punishments for the same offense.[20] We "may consider insufficient instructions 'in light of the full record' to determine if the instructions 'actually effected a double jeopardy error.'"[21]

Where multiple counts charge the same crime against the same victim occurring during the same time period, juries should be instructed that each count requires proof of a separate and distinct act.[22] But the absence of a separate and distinct act instruction is not fatal; it only creates the *potential* for a double jeopardy violation.[23]

There is no double jeopardy violation where the information, instructions, testimony, and argument make it "'manifestly apparent'" to the jury that the "'State

---

[19] State v. Land, 172 Wn. App. 593, 598, 295 P.3d 782 (2013).

[20] Id. (citing U.S. CONST. amend. V; WASH. CONST. art. I, § 9; State v. Mutch, 171 Wn.2d 646, 661, 254 P.3d 803 (2011)).

[21] State v. Pena Fuentes, 179 Wn.2d 808, 824, 318 P.3d 257 (2014) (quoting Mutch, 171 Wn.2d at 664).

[22] Mutch, 171 Wn.2d at 663.

[23] Id.

[was] not seeking to impose multiple punishments for the same offense.'"[24] "A defendant charged with multiple counts is adequately protected from any risk of double jeopardy when the evidence is sufficiently specific as to each of the acts charged."[25] Courts have also looked to whether the jury was instructed that it must be unanimous on each count and whether "different evidence is introduced to support each count."[26] Courts have acknowledged that a single instruction encompassing multiple counts rather than separate to convict instructions for each count can compound double jeopardy concerns.[27]

Sage contends it was not manifestly apparent that his conviction was based on separate and distinct acts.[28]

Here, the sexual acts occurred at three different houses, sometimes many times per week. J.M. testified in detail about the first time he had intercourse with Sage in the office of the Cattail Lane house. J.M. was almost 13 years old.[29] J.M. testified the second time they had sexual intercourse was in the garage of the

---

[24] Id. (alteration in original) (quoting State v. Berg, 147 Wn. App. 923, 931, 198 P.3d 529 (2008)).

[25] State v. Hayes, 81 Wn. App. 425, 439, 914 P.2d 788 (1996).

[26] Id. at 439-40.

[27] State v. Borsheim, 140 Wn. App. 357, 368, 165 P.3d 417 (2007).

[28] See Mutch, 171 Wn.2d at 665 ("Mutch's case presents a rare circumstance where, despite deficient jury instructions, it is nevertheless manifestly apparent that the jury found him guilty of five separate acts of rape to support five separate convictions.").

[29] J.M. said he could remember his exact age because he was "looking forward to [his] birthday." RP (Apr. 6, 2016) at 385.

same house several days later. J.M. also described having intercourse with Sage in the living room, Sage's bedroom, and his truck.

In closing argument, the State identified count 1 and walked the jury through the evidence presented at trial:

> *And Count I is focusing on [J.M.]'s first sexual intercourse with Jonathan Sage.* And what did you hear about that from [J.M.]? You heard [J.M.] describe how he was having trouble at school. He was emotional. He saw [E.M.] and the defendant drinking. He drank. He became emotional. The defendant was there to console him. They went in the office. They hugged. Things happened in the chair. They went to the floor. And [J.M.] described how Jonathan Sage, the defendant, had anal intercourse with [J.M.] . . . That was the first time he had ever had sex. He said he lost his virginity then. *That's Count I. That's what I want you to consider to be Count I.*[30]

The State then discussed count 2, describing it as the same elements, same actors, but a distinct event:

> [J.M.] said the second time was roughly a week later, about that much time, in the defendant's finished heated garage, kind of like a room but it was a garage. He talked about that. They again had . . . intercourse in that garage. Again, he was drinking.[31]

E.M. also testified about his first time having sexual intercourse with Sage at the Cattail Lane house. E.M. described how he and Sage were watching pornography together, which led to Sage having intercourse with E.M. E.M. testified the first time stood out in his mind and it was "fairly frequent" after that.[32]

---

[30] RP (Apr. 8, 2016) at 753 (emphasis added).

[31] RP (Apr. 8, 2016) at 754.

[32] "I'd say weekly." RP (Apr. 7, 2016) at 610.

E.M. described incidents where sexual contact with Sage's dog was initiated as a prelude to the sexual intercourse with E.M. E.M. said he also had intercourse with Sage at the Coles Road and Bercot Road houses.

In closing argument, the State discussed counts 3 and 4 and referred to E.M.'s testimony, emphasizing details of his first time having sex with Sage: "At age 12, [E.M.] describes that the first time they ever had sexual contact or intercourse with each other they were sitting on the futon. Mr. Sage suggest[ed] they watch some pornography together."[33] And for count 4, the State noted: "And count IV is again [E.M.]. [E.M.] described that they had sex often in the beginning *after it first started*. Sometimes multiple times a week but at least every week."[34]

Sage counters that J.M. and E.M. had "fuzzy memories" and gave "ambiguous evidence" about the timing and detail of the encounters.[35] But the State presented different evidence to support each count and walked the jury through that evidence in closing: count 1, J.M.'s first encounter in the office, count 2, J.M.'s encounter one week later in the heated garage, and count 3, E.M.'s first encounter on the futon. Even if E.M. vaguely described his subsequent sexual encounters with Sage, none could be confused with E.M.'s first encounter. As argued by the State in closing, E.M.'s first encounter on the futon, count 3, was necessarily separate and distinct from any of his subsequent encounters "after it

---

[33] RP (Apr. 8, 2016) at 759.
[34] RP (Apr. 8, 2016) at 755-56 (emphasis added).
[35] Appellant's Br. at 15.

11

first started"[36] which the jury may have relied on to support count 4.

After each elements instruction, the court instructed:

> The State of Washington alleges that the defendant committed acts of Rape of a Child in the Second Degree on multiple occasions. To convict the defendant on Count [I, II, III, IV] of Rape of a Child in the Second Degree, one particular act of Rape of a Child in the Second Degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Rape of a Child in the Second Degree.[37]

The trial court did not give a separate and distinct act instruction, but it did instruct the jury to decide each count separately: "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count."[38]

In view of the prosecutor's election of separate and distinct events in closing, the victim's supporting testimony, the unanimity instructions given, together with separate to convict instructions for each count and the separate consideration instruction, we conclude it was manifestly apparent to the jury that the State was not seeking multiple convictions based on a single act. Sage does not establish a double jeopardy violation.

---

[36] RP (Apr. 8, 2016) at 755-56.

[37] CP at 54, 56, 58, 60.

[38] CP at 45; see Hayes, 81 Wn. App. at 439-40 (reasoning that the lack of a "separate and distinct" act instruction is not dispositive, "so long as the jury is instructed as to the unanimity requirement on each count and different evidence is introduced to support each count."); see Mutch, 171 Wn.2d at 663 (noting that a unanimity instruction helps to protect against a double jeopardy violation if it informs the jury that at least one particular act must be proved beyond a reasonable doubt for each count).

## Evidentiary Challenges

### (i) Uncharged Conduct

Sage contends the court improperly admitted allegations of uncharged acts, including uncharged acts occurring after the charging periods.

Before trial, the State moved to admit uncharged incidents of sexual behavior under ER 404(b). The State also moved to admit evidence that Sage and E.M. had sexual contact with Sage's dog.

We review the trial court's interpretation of ER 404(b) de novo as a matter of law.[39] If the trial court interprets ER 404(b) correctly, we review the ruling to admit or exclude evidence of misconduct for an abuse of discretion.[40] "A trial court abuses its discretion where it fails to abide by the rule's requirements."[41]

"ER 404(b) is a categorical bar to admission of evidence for the purpose of proving a person's character and showing that the person acted in conformity with that character."[42]

The trial court must

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."[43]

---

[39] State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

[40] Id.

[41] Id.

[42] State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012).

[43] Id. at 421 (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

One proper purpose for admission of evidence of prior misconduct is to show a common scheme or plan.[44]

> There are two instances in which evidence is admissible to prove a common scheme or plan: (1) "where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan" and (2) where "an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes."[45]

Here, the trial court found by a preponderance of the evidence the misconduct in the form of sexual acts beyond the charging period actually occurred, identified the purpose of admitting the evidence, determined the relevance of the evidence to prove an element of the crime, and weighed its probative value against its prejudicial effect. Specifically, the court found the evidence to be "highly probative" because it went to "the heart of the nature of the State's case."[46] The court noted the jury would not likely "give undue prejudicial effect to this evidence."[47]

Sage also argues the trial court erred when it allowed testimony about the uncharged sexual activities with his dog. But the court acknowledged the potential for prejudice and admitted the evidence with specific limitations: "I first will exclude any evidence concerning the defendant having sexual contact with the dog *that did not occur in the context of the defendant also having sexual contact*

---

[44] Id.

[45] Id. at 421-22 (quoting State v. Lough, 125 Wn.2d 847, 854-55, 889 P.2d 487 (1995)).

[46] RP (Apr. 5, 2016) at 26.

[47] RP (Apr. 5, 2016) at 27.

*with [E.M.]*."[48] The court found by a preponderance of the evidence that the sexual contact with the dog did occur. The court concluded the limited evidence was admissible under the res gestae exception because it occurred in the immediate time frame of the instances of sexual abuse and it could also be characterized as part of the common plan, or grooming process,[49] and desensitizing E.M. to sexual acts.[50]

We conclude the trial court correctly applied ER 404(b), and its ruling to admit the evidence of misconduct was not an abuse of discretion.

*(ii) E.M.'s Marijuana and Gun Evidence*

Sage also contends he was denied the right to impeach his accuser when the trial court granted the State's motion to preclude evidence of E.M.'s marijuana use and access to firearms at his father's house. Sage suggests this evidence would rebut any implication that Sage introduced E.M. to illicit substances and guns. But E.M.'s exposure to those items at his father's house does not make a

---

[48] RP (Apr. 5, 2016) at 27 (emphasis added).

[49] State v. Quigg, 72 Wn. App. 828, 833, 866 P.2d 655 (1994) (grooming is "a process by which child molesters gradually introduce their victims to more and more explicit sexual conduct.").

[50] RP (Apr. 5, 2016) at 30-31; see State v. DeVincentis, 150 Wn.2d 11, 22, 74 P.3d 119 (2003) (evidence admitted under common scheme or plan exception included evidence that defendant walked around his house in front of preteen victims wearing nothing but "bikini or g-string underwear . . . to reduce the children's natural discomfort or negative reaction"); see State v. Krause, 82 Wn. App. 688, 697, 919 P.2d 123 (1996) (evidence of prior uncharged sex abuse of young boys was admissible to show a common scheme or plan to molest young boys).

material element of the crime more or less probable.[51] Neither do they call E.M.'s credibility into question.

Sage suggests his right to confrontation is also implicated. But he waived any confrontation clause arguments by failing to raise them in the trial court. In State v. O'Cain,[52] this court held confrontation clause objections must be raised in the trial court, as confirmed in Melendez-Diaz v. Massachusetts.[53]

> Thus, in Melendez-Diaz, the Supreme Court makes two things clear: (1) a defendant has the obligation to assert the right to confrontation at or before trial, in compliance with applicable trial court procedural rules, and (2) this obligation is part and parcel of the confrontation right itself, the parameters of which are based upon— and dependent upon—defendants being held to their obligation of timely assertion. In short, *the decision clearly establishes that, when a defendant's confrontation right is not timely assert, it is lost.*[54]

In O'Cain, the defendant raised a confrontation clause challenge to the admission of statements made by an absent witness.[55] This court concluded, "Because [the defendant] did not assert his confrontation clause objection at or before trial, he cannot obtain appellate relief on that claim."[56]

---

[51] See ER 401; RP (Apr. 8, 2016) at 674 ("So I would exclude any evidence of the photographs or other evidence of [E.M.] being in possession of a firearm at times other than what he's testified about or the matter that he testified about in his testimony."); RP (Apr. 8, 2016) at 676 ("And moving to the matter of marijuana, if . . . it was part of the res gestae, if you will, of the encounters that the defendant allegedly had with the alleged victims, then I believe I would need to permit that.").

[52] 169 Wn. App. 228, 279 P.3d 926 (2012).

[53] 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

[54] O'Cain, 169 Wn. App. at 240 (emphasis added).

[55] Id. at 232.

[56] Id.

In O'Cain, this court also recognized ER 103 is a rule the State is allowed to adopt governing the exercise of confrontation clause objections.[57] Pursuant to ER 103(a)(1), "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike is made, stating the *specific ground of objection*."[58] "A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial."[59]

Here, Sage failed to argue in the trial court that the confrontation clause supported his request to admit evidence of E.M.'s use of marijuana in other settings and E.M.'s experience with his father's guns. He may not raise the confrontation argument for the first time on appeal.

*(iii) Sage's Gun Ownership*

Sage argues testimony about guns in his home was unduly prejudicial and should have been excluded.

There was limited testimony about guns in Sage's home. E.M. testified that at one point he contemplated suicide and there was a pistol at Sage's house with a "very loose lock on it."[60] E.M. said he contemplated suicide because he was not happy. E.M.'s father testified, "I knew [Sage] owned a firearm and I thought it

---

[57] Id. at 242-43 ("As noted in Melendez-Diaz, 'States may adopt procedural rules governing the exercise of such [confrontation clause] objections.' Washington's Evidence Rule (ER) 103 is one such rule.") (alteration in original) (quoting Melendez-Diaz, 557 US. at 314 n.3).

[58] Id. at 243.

[59] State v. Koepke, 47 Wn. App. 897, 911, 738 P.2d 295 (1987).

[60] RP (Apr. 8, 2016) at 652.

17

might result in a hostage situation."[61] But Sage failed to timely object. Sage failed to preserve this claimed error.

### (iv) Pornography

E.M. testified that he and Sage would watch pornography together, which would lead to intercourse. Sage argues the evidence that he watched pornography and recorded sex acts with E.M. was unduly prejudicial, but Sage did not object to this testimony at trial. Sage may not raise this claimed error for the first time on appeal.

E.M. testified that Sage made video recordings of their sex acts. During the State's investigation, an Island County detective conducted a forensic examination of Sage's laptop. Sage's counsel and the State addressed the detective's testimony about the laptop and alleged videos of E.M. and Sage during motions in limine. The detective testified that during the investigation, they did not encounter any video recordings of these sex acts, but they found a laptop that was encrypted, therefore, they could not gain access to its files. Sage's counsel agreed to the admissibility of such testimony.[62]

---

[61] RP (Apr. 7, 2016) at 517.

[62] RP at 925-26 (Defense counsel said, "I actually spoke to Detective Wallace and Detective Peabody during interviews, and I have no objection with them testifying to what they've done . . . with computers and things of that nature. What I'm concerned about is them making expert opinion as to why it's encrypted."); see State v. Powell, 166 Wn.2d 73, 84, 206 P.3d 321 (2009) ("Defense counsel specifically agreed that the State could introduce testimony from [the defendant's roommate] regarding Powell's drug use on the day of the attempted burglary.").

Further, this evidence was germane to the State's theory of the case and the timeline of its investigation. We conclude the evidence's probative value outweighed any potential prejudicial effect and was properly admitted.

*Sage's Motion for Mistrial*

On the third day of trial, the State called E.M. as a witness.[63] The court reporter documented the following exchange:

[STATE]: Next witness will be [E.M.], Your Honor. . . .

[COURT]: All right.

(Witness enters the well of the courtroom, leans over, and glares at Defendant while walking in to be sworn.)[64]

Defense counsel objected and moved for a mistrial, characterizing the exchange as

[E.M.] walked past defense counsel and hissed at the Defendant, bent down, and made an aggressive stare. As best as I could tell, the jurors looked horrified. Their reaction is clear that the stance or that moment is going to live in their minds as opposed to what he testifies to. My client has a right to a fair trial, to be presumed innocent, [ ] and I don't know that he can get a fair trial with this jury after that behavior.[65]

The trial court sustained the objection but denied the motion for mistrial, ruling

[t]he next witness, who I presume is [E.M.], walked into the courtroom, came through the door of the bar, as it were. And as he did so, turned his head so as to look in the direction of the Defendant. He kind of craned his neck toward the Defendant and appeared to be staring at the Defendant for a couple of seconds.

---

[63] RP at 573.

[64] RP at 573.

[65] RP at 574.

[Defense counsel] made an objection at that point. And at that point, the Court took a recess without ruling on the objection.[66]

The court also noted, "I personally did not hear any hissing. I did not particularly observe the jurors' reactions except when I looked over at them after hearing the word 'objection' from [defense counsel]. I did not observe personally any untoward reactions on the part of the jury at that point."[67] The court gave a curative instruction agreed to by Sage's counsel.[68]

Sage argues his motion for a mistrial should have been granted because E.M.'s courtroom behavior prejudiced the jury.

We review the denial of a motion for mistrial for abuse of discretion.[69] The trial court should only grant a mistrial "when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried."[70] To determine the effect of the irregularity, we examine: (i) its seriousness; (ii) whether it involved cumulative evidence; and (iii) whether the trial court properly instructed the jury to disregard it.[71]

---

[66] RP at 575-76.

[67] RP at 576.

[68] "Ladies and gentlemen of the jury, I instruct you to disregard the events that occurred just prior to the last recess involving the next witness coming into the courtroom and what you may have observed in that regard." RP (Apr. 7, 2016) at 578.

[69] State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (quoting State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)).

[70] Id. at 764.

[71] Id.

In State v. Emery, our Supreme Court held the defendant was not entitled to a mistrial because his codefendant's courtroom outbursts that Emery was "lying"[72] were not the type of irregularities that have warranted mistrials in other cases, such as a police officer's sworn testimony about a defendant's past crimes,[73] (ii) the outbursts were consistent with his later testimony, and (iii) the trial court excused the jury and properly instructed it to disregard the outbursts.[74] And in State v. Bourgeois, our Supreme Court held two instances of spectator misconduct, glaring and making gun-mimicking gestures toward witnesses, though serious, did not warrant a new trial.[75]

Here, E.M. entered the courtroom and glared at Sage. The trial court denied Sage's motion for mistrial and entered a detailed ruling on the record. Unlike a verbal outburst or threatening gesture, E.M. glared at Sage. The court gave a curative instruction. E.M. did not repeat the behavior after the trial court instructed the jury to disregard the behavior. We conclude the trial court did not abuse its discretion.

*Community Custody Conditions*

Sage argues unconstitutionally vague or impermissible community custody conditions must be stricken. The State concedes the following conditions should

---

[72] 174 Wn.2d 741, 750, 278 P.3d 653 (2012).

[73] Id. at 765-66 (discussing State v. Miles, 73 Wn.2d 67, 436 P.2d 198 (1968)).

[74] Id. at 766.

[75] 133 Wn.2d 389, 411, 945 P.2d 1120 (1997).

be vacated: (i) condition 6 restricting daily travel at the community corrections officer's discretion, (ii) condition 12 prohibiting possession of drug paraphernalia, (iii) condition 15 prohibiting any Internet access, and (iv) condition 18 requiring Sage to participate in substance abuse treatment. We agree these conditions are unconstitutionally vague or insufficiently crime related, and thus should be stricken on remand.

### Statement of Additional Grounds for Review

In a statement of additional grounds, Sage argues the absence of the separate and distinct act jury instruction violated double jeopardy. But as discussed, this argument fails. He also makes various arguments about J.M. and E.M.'s credibility, but those determinations are for the trier of fact.

### Exceptional Sentence

Sage argues the trial court judge engaged in prohibited fact finding regarding the exceptional sentence, violating his right to trial by jury.

The Sixth Amendment to the United States Constitution guarantees criminal defendants a right to trial by jury. Seventeen years ago, the United States Supreme Court directed that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[76] Thirteen

---

[76] Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

years ago, the United States Supreme Court reaffirmed the prohibition on judicial fact finding in enhanced sentencing hearings.[77]

A series of statutory amendments and Washington cases have addressed the standards for exceptional sentences consistent with a defendant's constitutional right to jury trial.

RCW 9.94A.537(3) directs that "[t]he facts supporting aggravating circumstances shall be proved to a jury beyond a reasonable doubt. The jury's verdict on the aggravating factor must be unanimous, and by special interrogatory." RCW 9.94A.537(6) provides that if a jury unanimously finds beyond a reasonable doubt the existence of "one or more of the facts alleged by the state in support of an aggravated sentence," the court may impose an exceptional sentence "*if it finds*, considering the purposes of this chapter, that the facts found [by the jury] are substantial and compelling reasons justifying an exceptional sentence."[78] RCW 9.94A.535 authorizes a court to impose an exceptional sentence "*if it finds* . . . there are substantial and compelling reasons justifying an exceptional sentence."[79]

Washington cases recognize that once the jury by special verdict makes the factual determination whether aggravating circumstances have been proven beyond a reasonable doubt, "[t]he trial judge [is] left only with the legal conclusion

---

[77] Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[78] (Emphasis added.)

[79] (Emphasis added.)

23

of whether the facts alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence."[80] Sage disputes this authority, arguing a judge's determination whether an aggravating circumstance is substantial and compelling necessarily involves factual questions. While the authority he disputes is plentiful and longstanding, a fog lingers.

Despite the seemingly clear delineation of the limited role of the judge to determine whether jury findings are sufficiently substantial and compelling to warrant an exceptional sentence, sentencing judges face uncertainty. Not only do the statutes continue to refer to "findings" to be made by the judge on exceptional sentences,[81] our Supreme Court in State v. Friedlund emphasized that written rather than oral findings of fact by the judge are "essential" for an exceptional sentence.[82]

---

[80] State v. Suleiman, 158 Wn.2d 280, 290-91 & 291 n.3, 143 P.3d 795 (2006) ("In the context of discussions about standard of review, this court has held that whether a court's stated reasons are sufficiently substantial and compelling to support an exceptional sentence is a question of law. [State v. Cardenas, 129 Wn.2d 1, 6 n.1, 914 P.2d 57 (1997);] State v. Chadderton, 119 Wn.2d 390, 399, 832 P.2d 481 (1992); State v. Grewe, 117 Wn.2d 211, 215-16, 813 P.2d 1238 (1991); State v. Nordby, 106 Wn.2d 514, 418, 723 P.2d 1117 (1986). In contrast, whether an aggravating factor is present in a particular case, in other words, whether a stated reason is supported by the record, is a factual determination. Nordby, 106 Wn.2d at 517-18; see also Cardenas, 129 Wn.2d at 5 (applying a clearly erroneous standard to this question); State v. Fisher, 108 Wn.2d 419, 423, 739 P.2d 683 (1987); State v. Woody, 48 Wn. App. 772, 776, 742 P.2d 133 (1987). Thus, whether a particular aggravating factor is supported by the record is a question of fact, while the question of whether the found factors are sufficiently substantial and compelling is a matter of law.").

[81] RCW 9.94A.535; RCW 9.94A.537(6).

[82] 182 Wn.2d 388, 393-95, 341 P.3d 280 (2015).

The only permissible "finding of fact" by a sentencing judge on an exceptional sentence is to confirm that the jury has entered by special verdict its finding that an aggravating circumstance has been proven beyond a reasonable doubt.[83] Then it is up to the judge to make the legal, not factual, determination whether those aggravating circumstances are sufficiently substantial and compelling to warrant an exceptional sentence.

Here, the jury entered special verdict forms setting out specific findings that the aggravating circumstances had been proven beyond a reasonable doubt. The court made "findings of fact" noting that those special verdicts had been entered. Then the judge concluded that the jury findings presented "substantial and compelling" grounds for an exceptional sentence. Notably, at sentencing, the court recited the evidence that supported the jury findings. The court considered the purposes of the Sentencing Reform Act of 1981 and imposed an exceptional sentence, setting forth its written "findings of fact and conclusions of law" for an

---

[83] Whether a jury has entered a special verdict and the contents of the special verdict is normally apparent from the record on appeal, but it is not inappropriate for a judge to identify the process relied on in arriving at a decision. Weyerhaeuser v. Pierce County, 124 Wn.2d 26, 35-36, 873 P.2d 498 (1994) ("The purpose of findings of fact is to ensure that the decision maker 'has dealt fully and properly with all the issues in the case before he [or she] decides it and so that the parties involved' and the appellate court 'may be fully informed as to the bases of his [or her] decision when it is made.' Findings must be made on matters 'which establish the existence or nonexistence of determinative factual matters. The process used by the decision maker should be revealed by findings of fact and conclusions of law.") (alterations in original) (quoting In re LaBelle, 107 Wn.2d 196, 218-19, 728 P.2d 138 (1986)).

exceptional sentence as an appendix to the judgment and sentence.[84] It also found the exceptional sentence was "justified by each and every one of the special verdicts."[85] We conclude the trial court properly analyzed and articulated the basis for the exceptional sentence without engaging in prohibited fact finding.[86]

Finally, Sage argues that the State did not give adequate notice that the aggravating circumstances could be based on acts occurring outside the charging period and that the jury was permitted to find aggravating circumstances without unanimously agreeing the aggravating circumstances occurred within the charging period. But the premise of his argument is inaccurate. Inherent in each of the statutory aggravating circumstances is the requirement that the circumstances were part of the commission of the crime charged.[87] And the jury was instructed

---

[84] Clerk's Papers at 25-26.

[85] RP (May 12, 2016) at 882.

[86] Sage cites the United States Supreme Court decision in Hurst v. Florida, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016) in support of his argument that the judge engaged in prohibited fact finding. In Hurst, the Supreme Court held Florida's death penalty procedure violated the defendant's Sixth Amendment right to a jury trial because the jury's findings of aggravating factors were advisory, resulting in prohibited fact finding by the judge. But the Florida statute at issue expressly stated that the jury findings were "advisory." FLA. STAT. § 921.141 (2004). By contrast, under Washington procedure here, the jury exclusively resolves the factual question whether the aggravating circumstances have been proven beyond a reasonable doubt.

[87] Here, the jury answered "Yes" to special verdict form inquiries regarding special aggravating circumstances found in RCW 9.94A.535(3)(g) ("The offense was part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time."), RCW 9.94A.535(3)(j) ("The defendant knew that the victim of the current offense was a youth not residing with a legal custodian and the defendant established or promoted the relationship for the primary purpose of victimization."), and

26

they had to be unanimous beyond a reasonable doubt as to each of the aggravating factors. Sage relies on cases that do not apply to these facts, these instructions, and these aggravating circumstance special verdict forms.[88]

We also reject Sage's argument of cumulative error because there were not multiple errors capable of a cumulative impact.

We affirm and remand with instructions to strike community custody conditions 6, 12, 15, and 18.

WE CONCUR:

---

RCW 9.94A.535(3)(n) ("The defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense.").

[88] Sage cites State v. Williams-Walker, 167 Wn.2d 889, 897-98, 225 P.3d 913 (2010) (limits exceptional sentence to the findings by the jury) and State v. Severns, 13 Wn.2d 542, 548, 125 P.2d 659 (1942) (bars charging under one alternative means but instructing on another).